IN THE UTAH COURT OF APPEALS

----ooOoo----

| | | |
|---|---|---|
| State of Utah, | ) | MEMORANDUM DECISION |
| | ) | |
| Plaintiff and Appellee, | ) | Case No. 20110518-CA |
| | ) | |
| v. | ) | F I L E D |
| | ) | (October 25, 2012) |
| Gary Lee Moody, | ) | |
| | ) | 2012 UT App 297 |
| Defendant and Appellant. | ) | |

-----

Third District, Salt Lake Department, 101900688
The Honorable Randall N. Skanchy

Attorneys:     Brittany D. Enniss and Scott A. Wilson, Salt Lake City, for Appellant
               Mark L. Shurtleff and Kris C. Leonard, Salt Lake City, for Appellee

-----

Before Judges Davis, McHugh, and Voros.

DAVIS, Judge:

¶1     Gary Lee Moody appeals his conviction of one count of exploitation of a vulnerable adult, a third degree felony, *see* Utah Code Ann. § 76-5-111(4)(b)(ii) (LexisNexis Supp. 2012), and one count of issuing a bad check, a third degree felony, *see id.* § 76-6-505(1)(a), (3)(c), asserting that the evidence was insufficient to support a conviction of issuing a bad check and that the trial court erred by admitting the testimony of his parole officer. We reverse Moody's convictions and remand for a new trial.

¶2     The charges in this case arose out of Moody's interactions with an eighty-five-year-old retired dentist who had previously suffered several strokes (Victim). Moody

had previously met Victim while Victim was still working as a dentist. In March 2009, Moody visited Victim's home to tell him about an invention that he wanted to market. Moody told Victim that he needed some money in order to pay bank fees and to access money he had in an account. Victim gave Moody $200, and Moody promised to return later that day to repay the money and give Victim a return on his investment. Moody did not return that day or repay the money. However, Moody did return to Victim's home several times over the next few months to ask for additional money, each time promising to repay double or triple the amount invested. Victim's wife (Wife) became concerned and began to keep a record of Moody's visits and her husband's investments.

¶3     On August 11, 2009, Wife insisted that Moody sign a promissory note in the amount of $760 that would begin accruing interest after four days. The next day, Moody opened a checking account but did not put any money in it. Moody wrote two checks on that account to Victim and Wife for $930 and $600, but told them to wait a week or ten days before cashing the checks because there were no funds in the account. After ten days, Moody told Victim and Wife to wait a little longer before cashing the checks. Wife was still unable to cash the checks when she tried to do so in late October or early November. Victim made at least six additional payments to Moody after receiving the checks. All told, Moody visited Victim approximately twenty times between March and December 2009 and Victim gave Moody at least $4,080. In December 2009, Wife contacted the district attorney's office, which began an investigation.

¶4     Moody was charged with exploitation of a vulnerable adult, issuing a bad check, and theft by deception. The theft by deception charge was ultimately dropped prior to trial. At trial, the court granted Moody's motion to exclude evidence of his prior convictions so long as he did not testify. Nevertheless, it permitted the State to introduce testimony from Moody's parole officer that Moody was forbidden to handle investment money as a condition of his parole and that Moody owed a significant amount of restitution and was delinquent in making restitution payments. Moody moved for mistrial on the basis of this evidence, but the trial court denied the motion. At the close of trial, Moody also moved for directed verdicts on both charges based on insufficient evidence, but the trial court denied the motion as to both charges.[1]

---

[1]On appeal, Moody renews only his assertion that there was insufficient evidence to support a conviction of issuing a bad check. He does not renew his challenge to the sufficiency of the evidence with respect to the exploitation of a vulnerable adult charge.

¶5     Moody argues that the trial court erred by denying his motion for directed verdict on the bad check charge[2] because he claims there was insufficient evidence to prove that he wrote the checks "for the purpose of obtaining from any person . . . any money, property, or other thing of value or paying for any services, wages, salary, labor, or rent," *id.* § 76-6-505(1)(a). We review the trial court's denial of a motion for directed verdict for correctness. *See State v. Hirschi*, 2007 UT App 255, ¶ 15, 167 P.3d 503. We will reverse only if the evidence, viewed "in the light most favorable to the verdict, . . . is sufficiently inconclusive or inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime of which he was convicted." *Id.* (citation and internal quotation marks omitted).

¶6     The State presented evidence that Wife was becoming increasingly concerned about her husband's payments to Moody, leading her to demand that Moody sign a promissory note in the amount of $760 that would begin accruing interest after four days, and that the day the promissory note was signed, Moody left Victim's home without receiving any money. The day after this event, Moody opened an unfunded checking account, and within the week, he wrote two checks to Victim and Wife totaling $1,530 as a show of "good faith" and told them they could cash the checks within seven to ten days. After Moody wrote the checks, he obtained at least another $1,150 from Victim before Wife contacted the police and initiated an investigation. Based on this evidence, the jury could have reasonably concluded that Moody wrote the checks in an effort to ease Wife's concerns so that he could continue obtaining money from Victim. This satisfies the statute's requirement that the bad check be written "for the purpose of obtaining . . . [some]thing of value," *see* Utah Code Ann. § 76-6-505(1)(a) (LexisNexis Supp. 2012).[3]

---

[2]Although we reverse and remand for a new trial on the basis of the parole officer's testimony, *see infra* ¶ 13, we address Moody's challenge to the trial court's ruling on his motion for directed verdict because it raises an issue of the sufficiency of the evidence that is likely to arise on remand. *See generally* Utah R. App. P. 30(a) ("If a new trial is granted, the court may pass upon and determine all questions of law involved in the case presented upon the appeal and necessary to the final determination of the case.").

[3]The State alternatively asserts that the checks were written in return for Victim's previous investments and should therefore be considered to have been "for the purpose of obtaining . . . [a] thing of value," *see* Utah Code Ann. § 76-6-505(1)(a) (LexisNexis

(continued...)

¶7     Moody next argues that the trial court erred by admitting the testimony of his parole officer, which indicated that Moody had been on parole, because any probative value the evidence may have had was outweighed by the danger of unfair prejudice under rule 403 of the Utah Rules of Evidence, *see* Utah R. Evid. 403. "[I]n reviewing a trial court's ruling on the admissibility of evidence under [r]ule 403, we will not reverse the trial court's determination absent an abuse of discretion." *State v. Alonzo*, 932 P.2d 606, 613 (Utah Ct. App. 1997) (citation and internal quotation marks omitted). The analysis of this issue requires us to determine "whether, as a matter of law, the trial court's decision that the unfairly prejudicial potential of the evidence outweighs [or does not outweigh] its probativeness was beyond the limits of reasonablity." *Harline v. Barker*, 912 P.2d 433, 441 (Utah 1996) (alteration in original) (citations and internal quotation marks omitted).

¶8     Moody asserts that his parole officer's testimony relating to his "previous conviction of a similar offense, current status as a parolee, violation of his parole when he borrowed investment money, failure to inform the parole officer of his involvement with the [business venture], and failure to make payments on the State's restitution order was not relevant." Alternatively, he asserts that this testimony's "minimal probative value was substantially outweighed by [its] prejudicial impact."

¶9     The only aspect of the parole officer's testimony that we consider relevant is the portion relating to Moody's owing restitution. This testimony was highly probative of Moody's deceptive intent because it demonstrated that despite Moody "making the

---

³(...continued)
Supp. 2012), despite the fact that the checks were tendered several months after Victim began making investments, *see State v. Robison*, 2006 UT 65, ¶ 39, 147 P.3d 448 ("[T]he purpose for passing a bad check may be established without any evidence regarding when the check was passed relative to when the thing of value to which it is linked was acquired."). Because we conclude that the evidence was sufficient to support a determination that the checks were written in order to obtain future investments from Victim, we need not determine whether a bad check written as a return on a prior investment might meet the purpose element of the bad check statute. *See, e.g., id.* ¶¶ 38–40 (distinguishing between a payment on an antecedent debt and a single payment—made contemporaneously or otherwise—for something of value, such as goods or services, in analyzing the purpose element of the bad check statute). We also need not resolve the parties' dispute regarding whether the funds Victim paid to Moody are more properly characterized as a loan or an investment.

victim promises of a double or triple return on his money[,] . . . it[ was] apparent that he had no ability to repay any funds whatsoever . . . because of the large debt that was owed to the state of Utah." As the trial court observed, "[t]he fact that [Moody] has debt that is so substantial that it would choke a horse . . . is relevant" in this context.[4]

¶10    On the other hand, the parole officer's testimony that it was a violation of Moody's parole for him to handle investment money and that Moody failed to inform the parole officer that he was doing so is not probative of Moody's intent to deprive Victim of his property, *see* Utah Code Ann. § 76-5-111(4)(a)(i) (LexisNexis Supp. 2012) ("A person commits the offense of exploitation of a vulnerable adult when the person . . . has undue influence over the vulnerable adult and knowingly, by deception or intimidation, obtains or uses, or endeavors to obtain or use, the vulnerable adult's funds, credit, assets, or other property with the intent to temporarily or permanently deprive the vulnerable adult of the use, benefit, or possession of the adult's property . . . ."); *see also id.* § 76-6-505(1)(a). The State asserts that this evidence implies that Moody's investment activities were illegitimate. However, if Moody was prohibited from handling investment funds as a condition of his parole, it would be expected that he would conceal any investment activities, legitimate or otherwise, from his parole officer. It is also unlikely that he would reveal his parole restriction to potential investors, regardless of whether he intended to cheat them. While such deceptions were certainly inappropriate and likely violated Moody's parole, they are not relevant to the question of whether Moody intended to deprive Victim of his property.

¶11    Evidence of Moody's previous conviction and his status as a parolee was admitted only incidentally as a result of the parole officer's testimony regarding these other issues and was significantly limited by the trial court in an effort to minimize the prejudicial impact of the parole officer's testimony. *Cf. State v. Dominguez*, 2003 UT App 158, ¶¶ 23, 28, 72 P.3d 127 (explaining that where the trial court permitted "limited allusions to Defendant's parole status [only to the extent they were] necessary as context for Defendant's statements to the police," the trial court's limitations "reasonably assured [that the evidence] was more probative than prejudicial"). The actual crime was never identified, and the trial court instructed the jury that evidence of Moody's prior crime "was brought to [its] attention only to help [it] evaluate the

--------

[4]Although Moody's indebtedness could have been established without indicating that it was part of his sentence for a prior criminal conviction, that fact is relevant. Where non-payment might affect Moody's parole status, he was strongly motivated to obtain the funds necessary to meet his restitution obligation.

credibility of the defendant as a witness," could not be used "for any other purpose," and was "not evidence that defendant is guilty of the crimes for which he is now on trial."[5] *See State v. Auble*, 754 P.2d 935, 938 (Utah 1988) (observing that "a carefully drafted limiting instruction" may reduce "the potential for prejudice"). *See generally State v. Burk*, 839 P.2d 880, 883 (Utah Ct. App. 1992) ("In the absence of the appearance of something persuasive to the contrary, we assume that the jurors were conscientious in performing to their duty, and that they followed the instructions of the court." (citation and internal quotation marks omitted)). While the jury's very knowledge that Moody previously committed a crime may carry the potential for unfair prejudice, this carefully limited evidence, incidentally admitted, would not necessarily make the parole officer's testimony inadmissible. *See State v. Daniels*, 584 P.2d 880, 882 (Utah 1978) ("[T]he fact that [relevant evidence] may tend to connect the defendant with another crime will not render it incompetent."); *State v. Tibbets*, 2012 UT App 95, ¶ 8, 275 P.3d 1047 (mem.) (explaining that in order for relevant evidence to be excluded under rule 403, its "'probative value [must be] *substantially* outweighed by the danger of unfair prejudice'" (quoting and adding emphasis to Utah R. Evid. 403 (2011))).

¶12 However, evidence regarding Moody's restriction from handling investment funds revealed one additional piece of information relating to Moody's conviction—the fact that his prior conviction was likely for a crime similar to the one with which he was charged.[6] Had the parole officer merely testified regarding the restitution Moody owed as a result of a prior conviction, the jury would not have known what that prior conviction was. The probative value of the restitution evidence would have outweighed the potential prejudice of the revelation that Moody had been convicted of some sort of prior crime. However, by testifying that Moody was restricted from handling investment funds and then further clarifying that parole restrictions are generally put in place for the purpose of preventing parolees from "re-offend[ing] to a similar crime," the parole officer unnecessarily implied that Moody's previous crime involved mishandling of investment funds. This implication would not be so offensive if there were any probative value to the parole officer's testimony regarding Moody's parole

---

[5]This instruction is confusing in light of the fact that Moody did not testify. While the jury may have recognized that it could not use evidence of his prior conviction for any purpose when Moody never became a witness, it is also possible that it indulged the opposite inference.

[6]This arguably fell within the ambit of the trial court's earlier ruling excluding evidence of prior crimes.

restrictions. However, as we can see no probative value in that testimony, *see supra* ¶ 10, we determine that the parole officer's testimony on this point was unduly prejudicial.

¶13    In sum, we determine that the trial court did not err in denying Moody's motion for directed verdict because the State presented sufficient evidence in support of the bad check charge. We also determine that the trial court did not exceed its discretion by permitting the parole officer to testify regarding the restitution Moody owed. Nevertheless, because we conclude that the parole officer's testimony that Moody was restricted from handling investment funds in an effort to prevent him from re-offending lacked probative value, we determine that the trial court should have granted Moody's motion for mistrial. We thus reverse Moody's convictions and remand the case for a new trial.


_____
James Z. Davis, Judge


-----


¶14    WE CONCUR:


_____
Carolyn B. McHugh, Judge


_____
J. Frederic Voros Jr., Judge