2014 UT App 143

STATE of Utah, Plaintiff and Appellee,

v.

Daniella RUIZ, Defendant and Appellant.

No. 20090466–CA.

Court of Appeals of Utah.

June 19, 2014.

Margaret P. Lindsay and Douglas J. Thompson, for Appellant.

Sean D. Reyes and Jeffrey S. Gray, for Appellee.

Judge STEPHEN L. ROTH authored this Opinion, in which Judge JAMES Z. DAVIS and Senior Judge JUDITH M. BILLINGS concurred.[1]

### Opinion

ROTH, Judge:

¶ 1 The State charged Daniella Ruiz with depraved indifference murder and reckless child abuse homicide after an infant died in her care and an autopsy revealed that the infant's internal injuries were consistent with shaken-baby syndrome. Before Ruiz's trial, the Utah Department of Child and Family Services (DCFS) took Ruiz's children into protective custody and conducted an investigation. DCFS ultimately dismissed its case in juvenile court, but not before making a supported finding of child abuse against Ruiz in connection with the infant's death. At trial, the district court decided that Ruiz's testimony about the DCFS investigation implied that DCFS had found her innocent of any wrongdoing, and the court permitted a DCFS case manager to testify in rebuttal regarding the agency's child abuse findings. Later, the court denied Ruiz's request for a jury instruction on negligent homicide and sent the case to the jury on the State's alternative charges of depraved indifference murder and reckless child abuse homicide. The jury convicted Ruiz of reckless child abuse homicide.

¶ 2 On appeal, Ruiz argues that the caseworker's rebuttal testimony was improperly admitted and that she was legally entitled to an instruction on negligent homicide. We affirm.

### BACKGROUND [2]

¶ 3 Maria Zamora dropped off her five-month-old son (Child) at Ruiz's home around 11:20 a.m. on January 4, 2006. Child was recovering from an illness that Zamora had first noticed the day after Christmas, but by early January he seemed to be on the mend; that morning, Child was "playing, moving his hands and his feet," and feeding without any difficulty. Child was asleep when Zamora arrived at Ruiz's home, so she brought him inside in his car seat. Before Zamora left for work, she noticed that Child "was breathing fine" and moved a little as she carried the car seat from her car to the home.

---

1. The Honorable Judith M. Billings, Senior Judge, sat by special assignment as authorized by law. *See generally* Utah Code Jud. Admin. R. 11–201(6).

2. "On appeal, we review the record facts in a light most favorable to the jury's verdict, and we recite the facts accordingly." *State v. Johnson*, 821 P.2d 1150, 1153 (Utah 1991) (citations omitted). But when analyzing whether Ruiz was entitled to a lesser-included-offense instruction on negligent homicide, we construe the facts in the light most favorable to Ruiz. *See infra* ¶ 22.

¶ 4 According to Ruiz, she did not want to babysit that day. She had an ear infection, her children were sick, and she was recovering from a migraine headache she had the night before. She was also worried that she might be pregnant—something her doctor had urged her to avoid for at least one more year. After Zamora left, Ruiz put the car seat on the floor in the master bedroom so Child could continue sleeping while she tended to her two children. She checked on Child periodically to make sure he was still asleep. When she heard him stirring, she picked him up because she "thought he was uncomfortable" and noticed he needed a new diaper. Child was "very sleepy" while Ruiz changed his diaper and clothes, but she said that she did not notice anything that indicated he was unwell. Before she was done, Ruiz's children came into the room and her three-year-old son started jumping on the bed. As Ruiz's younger son began to cry, Child seemed frightened, and Ruiz struggled to comfort the baby while encouraging her children to leave the room. The State alleged that at some point after Zamora left and before Ruiz's husband returned from a job interview, Ruiz responded to her mounting stress by violently shaking Child.

¶ 5 When Ruiz's husband arrived shortly before 1:00 p.m., he saw Child in the car seat and immediately noticed that something was wrong. Ruiz picked him up and tried to feed him a bottle, but Child would not open his mouth and his arm went limp. Ruiz called 911. Minutes later, police and paramedics arrived and found Child in full cardiac arrest. They rushed him to Utah Valley Regional Medical Center where doctors attempted to stabilize him before he was flown to Primary Children's Hospital. The next day, he was taken off life support and died. Physicians determined that the most likely cause of Child's death "was that he had been hurt, physically harmed." Specifically, they concluded that "some rapid motion of the head" followed by a "rapid stop" injured Child's brain, causing the brain to swell and die. The state medical examiner who performed Child's autopsy concluded that he was likely "grabbed ... around the lower torso[,] ... shaken ... violently[,] and then tossed ... or thrown onto a bed."

¶ 6 The night before Child died, police visited Ruiz's home to investigate whether she was involved in his injuries. They spoke with Ruiz for more than two hours, and she went to the police station the next morning for additional questioning. During these interviews, she told police that just before she called 911, she gently shook Child in an attempt to wake him up, but she insisted that she "didn't shake the baby very hard because" she knows "that's bad for a baby." Ruiz also admitted that Child was under her exclusive care before he was rushed to the hospital, and she told investigators that while she could "picture" herself hurting Child, she did not know what had happened, and she offered that she may have blocked out the memory. In March 2006, Ruiz was charged with depraved indifference murder, or in the alternative, reckless child abuse homicide.

¶ 7 At trial, Ruiz asserted that Child had a bleeding disorder that mimicked injuries doctors often see in children who have been shaken. In support, she offered testimony from two expert witnesses, Dr. Robert Rothfeder and Dr. John Graham. Dr. Rothfeder testified that Child most likely died from "a malfunction in the ability of the blood to clot, which resulted in bleeding inside the head" that "rapidly evolved and caused the cardio respiratory arrest and ultimately brain death." He opined that the disorder may have been caused by a vitamin K deficiency, which can occur in breast-fed infants. But he acknowledged that Child received a vitamin K shot at birth and that Child's diet was half formula and half breast milk. He also admitted that he had not reviewed the CT scans showing the bleeding inside Child's head.

¶ 8 Dr. Graham testified that "there had been a previous bleed" in Child's brain "as long as a month prior" to his admission to the hospital. The old bleed and hemorrhaging in other areas of Child's body, Dr. Graham claimed, was evidence that Child died from a "spontaneous bleed" in his brain that was consistent with a "[c]oagulation defect." On cross-examination, he admitted that he did not look at Child's CT scans and that the radiologist at Primary Children's was in the

best position to determine whether there was enough intracranial bleeding to cause Child's brain to swell.

¶ 9 The State's experts testified that Child died from a "severe acceleration/deceleration brain trauma" that resulted in "a massive brain injury that caused his brain to swell and die." Dr. Richard Boyer, a pediatric radiologist at Primary Children's Hospital, showed Child's CT scans to the jury and testified that the injuries he observed were consistent with "injured or damaged brain tissue." He also noted the presence of what appeared to be "an older hemorrhage" around Child's brain but said that the results of an autopsy would be more conclusive. Dr. Todd Grey, Utah's Chief Medical Examiner, testified that he "did not see any evidence of old bleeding" in reviewing the results of the autopsy and that he did not believe Child suffered from a bleeding disorder because there was "a very distinct series of hemorrhages and patterns of hemorrhage in this child, not the kind of diffuse bleeding problems that would indicate this child is going to bleed no matter what happens because he can't clot blood." The assistant state medical examiner that performed the autopsy and Child's physicians at Primary Children's agreed that his internal injuries were consistent with a traumatic injury, not a bleeding disorder.

¶ 10 Ruiz testified in her own defense. After describing her version of the circumstances surrounding Child's death and the subsequent criminal investigation, she recounted a DCFS investigation conducted shortly after Child's death. While she acknowledged that DCFS removed her children from her home for two days and did not permit her to be alone with them until the investigation was complete several months later, Ruiz testified that she never admitted to being negligent or abusive. She described DCFS's investigation, noting that DCFS had observed her care for her children and had conducted interviews with her neighbors. She then stated that DCFS investigators "probably did a better investigation ... than [the] Provo Police and they closed their case. They didn't charge me with anything."

¶ 11 Over Ruiz's objection, the State called Alicia Stoker-the DCFS case manager assigned to the investigation-as a rebuttal witness. She explained that when a case worker "feels that the children are at risk," courts can remove children from their home or order protective supervision services. In this case, Stoker testified that both steps were taken; Ruiz's children were initially removed from her home and then returned to her care contingent on Ruiz completing a psychological evaluation and agreeing not to be alone with her children without another adult present. Stoker then explained that DCFS concludes an investigation by making one of two findings: (1) supported, meaning "that the allegations that were called in and investigated have enough evidence that they would hold up in our system to be true," or (2) "without merit," meaning "that there was not enough information or support to keep those allegations." After clarifying that DCFS's findings are not based on the same standard of proof employed in criminal proceedings, Stoker testified that the findings in Ruiz's case "supported physical abuse ... due to an infant dying in her care according to the information that the [case] worker got from the doctors and the hospital."

¶ 12 At the close of the evidence, the court instructed the jury on the alternative charges of depraved indifference murder and reckless child abuse homicide and denied Ruiz's request for an instruction on a lesser included offense of negligent homicide, a class A misdemeanor. *See* Utah Code Ann. § 76-5-206(2) (LexisNexis 2003) (current version at *id.* (LexisNexis 2012)). Ruiz did not ask the court for an instruction on criminally negligent *child abuse* homicide, which at the time of trial was a third degree felony. *See id.* § 76-5-208(1)(b)(c). The jury found Ruiz guilty of reckless child abuse homicide. She appeals.

## ISSUES AND STANDARDS OF REVIEW

¶ 13 Ruiz raises two issues on appeal. First, she argues that the district court erred when it refused to instruct the jury on negligent homicide. Specifically, she contends that "because the elements of child abuse homicide and negligent homicide overlap"

and the evidence presented at trial "supports a rational basis" that Ruiz harmed Child negligently instead of recklessly, the court's refusal to instruct the jury on negligent homicide "denied her due process and statutory rights." "Whether a jury instruction on a lesser included offense is appropriate presents a question of law," so we review the trial court's decision for correctness. *State v. Spillers*, 2007 UT 13, ¶ 10, 152 P.3d 315; *see also State v. Burke*, 2011 UT App 168, ¶ 18, 256 P.3d 1102.

¶ 14 Second, Ruiz argues that the court wrongly admitted portions of the DCFS case manager's rebuttal testimony "that the agency had made substantiated findings against Ruiz for physical abuse . . . due to an infant dying in her care." (Internal quotation marks omitted.) Ruiz claims that this statement was irrelevant and "substantially more prejudicial than probative" under rules 402 and 403 of the Utah Rules of Evidence. District courts have "broad discretion in determining the nature and extent of rebuttal evidence, and we review a district court's ruling regarding the nature and extent of such evidence for an abuse of discretion." *State v. Martin*, 2002 UT 34, ¶ 29, 44 P.3d 805.

## ANALYSIS

¶ 15 We conclude that Ruiz was not entitled to a lesser-included-offense instruction on negligent homicide under the circumstances of this case. We also conclude that Ruiz opened the door to the DCFS case manager's testimony and that the trial court's decision to admit it was not an abuse of discretion.

### I. Negligent Homicide Instruction

¶ 16 A criminal defendant is entitled to an instruction on a lesser included offense when (1) "the charged offense and the lesser included offense have overlapping statutory elements" and (2) "the evidence 'provides a rational basis for a verdict acquitting the defendant of the offense charged and convicting him of the included offense.'" *State v.*

*Powell*, 2007 UT 9, ¶ 24, 154 P.3d 788 (quoting *State v. Baker*, 671 P.2d 152, 159 (Utah 1983)); *see also* Utah Code Ann. § 76–1–402(3), (4) (LexisNexis 2003). The district court properly denied Ruiz's request to instruct the jury on negligent homicide because even though there is some overlap between the elements of negligent homicide and reckless child abuse homicide, there was no reasonable basis in the evidence for the jury to convict Ruiz of negligent homicide while acquitting her of reckless child abuse homicide.

### A. Overlapping Statutory Elements

¶ 17 A lesser offense is included within a charged offense only if both offenses have overlapping statutory elements. *Baker*, 671 P.2d at 158–59. "This will depend on whether there exist[s] some overlap in the statutory elements of allegedly included offenses and whether the same facts tend to prove elements of more than one statutory offense." *Powell*, 2007 UT 9, ¶ 25, 154 P.3d 788 (alteration in original) (citation and internal quotation marks omitted). We begin, then, by examining the language of the pertinent statutory provisions. Reckless child abuse homicide occurs when a person "causes the death of a person under 18 years of age and the death results from child abuse, as defined in Subsection 76–5–109(1)." Utah Code Ann. § 76–5–208 (LexisNexis 2012).[3] Section 76–5–109 defines child abuse as "inflict[ing] upon a child" any serious physical injury or allowing another "to inflict serious physical injury upon a child" while the child is in the person's custody. *Id.* § 76–5–109(1)(c), (2). A "serious physical injury" means any injury that "seriously impairs the child's health; . . . involves physical torture; . . . causes serious emotional harm . . .; or . . . involves a substantial risk of death." *Id.* § 76–5–109(1)(f)(i). As examples, the statute lists bone fractures, burns, head injuries caused by blows or shaking, "any conduct that results in starvation or failure to thrive or malnutrition that jeopardizes the child's life," or conduct that "causes a child to cease breathing." *Id.* § 76–5–109(1)(f)(ii). Child abuse can be inflicted knowingly, recklessly,

---

3. Except where otherwise noted, we cite the current version of the Utah Code where the relevant provisions have not changed in any way material to our analysis.

or with criminal negligence. *Id.* § 76–5–109(2)–(4).

¶ 18 Negligent homicide, Ruiz's proposed lesser included offense, occurs when a person, "acting with criminal negligence, causes the death of another." *Id.* § 76–5–206(1). The word "another" is broad enough to include children and therefore seems to bring the criminally negligent death of a child within the scope of negligent homicide. The State argues, however, that "[b]ecause the child abuse homicide statute contains its own negligence variant, negligent homicide is never an option when death results from child abuse." In other words, the State contends that the statutory definition for criminally negligent child abuse exhaustively proscribes all criminally negligent conduct that could cause the death of a child, indicating the legislature's decision to punish child abuse homicide more severely than other homicides. *See State v. Williams,* 2007 UT 98, ¶ 12, 175 P.3d 1029 ("A legislature is clearly justified when it determines that taking the life of another in the course of committing an additional and distinct criminal act is ... worthy of more severe sanction than murder committed under other circumstances."); *see also supra* ¶ 12 (noting that at the time of Ruiz's conviction, negligent child abuse homicide was a third degree felony while negligent homicide was a class A misdemeanor).

¶ 19 Ruiz argues that the statute's definition of child abuse is not as comprehensive as the State suggests. Rather, she contends, "one could be guilty of negligent homicide for omissions, or a failure to act" that results in a child's death, but "child abuse homicide requires the defendant to *inflict* injury." (Emphasis added.) She also maintains that the elements of reckless child abuse homicide and negligent homicide overlap in two respects. First, "[e]ach offense requires causing a death," and second, "the definitions of negligence and recklessness overlap" because both require "a gross deviation from the standard of care exercised by an ordinary person." *See* Utah Code Ann. § 76–2–103(3), (4) (defining criminal negligence and recklessness as both involving "a gross deviation from the standard of care that an ordinary person would exercise"). In support of her

position, Ruiz cites a Utah Supreme Court case that held that the elements of first degree murder overlap with the elements of felony murder even though first degree murder punishes intentional killings and felony murder may encompass unintentional killings. *See State v. Hansen,* 734 P.2d 421, 424 (Utah 1986). She also points to language in one of our cases recognizing that negligent homicide can be a lesser included offense of reckless manslaughter because each offense involves "a gross deviation from the standard of care" and "[t]he sole difference is that [reckless] manslaughter requires that the defendant was actually aware of the risk of death, while in negligent homicide, the defendant was not, but should have been aware of such risk." *State v. Day,* 815 P.2d 1345, 1349 (Utah Ct.App.1991) (citation and internal quotation marks omitted). But Ruiz has not cited any Utah case, and we have found none, that directly addresses the issue presented here—whether negligent homicide and reckless child abuse homicide have overlapping statutory elements.

¶ 20 With respect to deaths caused by child abuse, we agree with the State that the legislature has designated child abuse homicide for special treatment, thus precluding negligent homicide from becoming a lesser included offense where the cause of death falls within the statutory definition of child abuse. But we believe Ruiz is correct that section 76–5–109's child abuse definition does not necessarily include all criminally negligent conduct that could cause the death of a child. As we have discussed, the statute defines child abuse as conduct that "inflicts upon a child serious physical injury" or "causes or permits" another person to do the same. Utah Code Ann. § 76–5–109(2). As examples of serious physical injuries, it lists bone fractures; burns; head injuries caused by "blows" or "shaking"; or any other conduct that causes a child to stop breathing, starve, or suffer severe emotional harm. *Id.* § 76–5–109(1)(f)(ii).

¶ 21 While there are certainly circumstances in which a caregiver's inattention or failure to act could constitute "conduct that causes" a child to stop breathing, suffer emotional harm, starve, or sustain other inju-

ries, *see id.*, the interpretive principle of ejusdem generis provides that "catchall elements of statutory lists may be understood as restricted to include things of the same kind, class, character, or nature as those specifically enumerated, unless there is something to show a contrary intent," *State v. Bagnes*, 2014 UT 4, ¶ 19, 322 P.3d 719 (citation and internal quotation marks omitted). Here, the statute is replete with examples of injuries caused by active abuse, like "blows, shaking, or causing the child's head to impact with an object or surface; ... use of a dangerous weapon"; or "placing a hot object upon the skin or body of the child." *Id.* § 76-5-109(1)(f)(ii). These examples directly precede more general references to "any conduct" that causes a child to starve, stop breathing, or suffer emotional harm. *Id.* And where the statute refers to neglect, the pertinent provisions discuss withholding food or "allowing another" to inflict injury on a child in the person's custody. *Id.* § 76-5-109(1)(f)(ii)(J), (2). So mere inattention or poor supervision that causes harm distinct from malnutrition falls outside the scope of the class implied by the series of specific terms that precede the statute's catchall phrase. We therefore conclude that negligent homicide and reckless child abuse homicide have overlapping statutory elements and negligent homicide can be a lesser included offense of child abuse homicide under the narrow circumstance where the evidence reasonably supports a conclusion that a caregiver's criminally negligent omission or failure to act caused the child's death. *See State v. Velarde*, 734 P.2d 449, 451 (Utah 1986) (noting that the statutory elements of the crime charged and a requested lesser included offense overlap where the lesser included "offense is established by proof of the same or less than all of the facts required to establish the commission of the offense charged").

## B. Rational Basis

¶ 22 Ruiz would therefore be entitled to an instruction on negligent homicide if there were a rational basis in the evidence to acquit her of reckless child abuse homicide and convict her of negligent homicide. *See State v. Powell*, 2007 UT 9, ¶ 24, 154 P.3d 788. This inquiry requires the trial court to view "the evidence in the light most favorable to the defendant requesting the instruction," *id.* ¶ 27, and prohibits weighing credibility or conflicting evidence, *State v. Garcia–Vargas*, 2012 UT App 270, ¶ 16, 287 P.3d 474. Instead, the district court "must ... determine 'whether there is a sufficient quantum of evidence to send [the] issue to the jury.'" *Id.* (alteration in original) (quoting *State v. Kruger*, 2000 UT 60, ¶ 14, 6 P.3d 1116). After carefully examining the testimony and exhibits presented at trial, we conclude that the trial court did not err in refusing to give a negligent homicide instruction, because there is no rational basis in the evidence to acquit Ruiz of reckless child abuse homicide and convict her of negligent homicide.

¶ 23 Ruiz argues that there are two reasonable interpretations of the evidence consistent with a theory that she caused Child's death without committing child abuse: (1) Child had a preexisting bleeding disorder and was in obvious distress, but Ruiz negligently ignored him until it was too late to save him (the neglect theory), and (2) Ruiz gently shook Child and exacerbated a prior intracranial bleed, but the shaking was not violent enough to satisfy the statutory definition of child abuse (the slight-shaking theory). We begin by examining the evidence pertinent to the medical claim that underlies both theories, i.e., that child's death resulted not directly from trauma, but from a rebleed of a prior injury or a coagulant deficiency. Having concluded that sufficient evidence exists to support such a theory, we then separately address whether the evidence adequately supports Ruiz's claim that the jury could have acquitted her of reckless child abuse homicide and convicted her of negligent homicide based on her neglect theory or slight-shaking theory.

### 1. Child's Intracranial Bleeding

¶ 24 Although the evidence was conflicting and strongly disputed by the State, it supports the defense's theory that a prior intracranial injury began to bleed again, causing the Child's brain to swell and leading to his death.

¶ 25 Defense expert Dr. Graham testified that "there had been a previous bleed" within Child's cranium that could have occurred "as long as a month prior to [Child's] final admission" to the hospital. He opined that Child's death was caused when this older injury spontaneously began bleeding the day Child died and Child's coagulation defect prevented his blood from clotting until there was enough blood built up around his brain that the pressure caused it to swell and eventually die. But he also admitted that he never looked at Child's CT scans, and he agreed that a radiologist would be in the best position to determine whether there was enough intracranial bleeding to damage Child's brain. Dr. Rothfeder also testified for the defense that a spontaneous bleed caused Child's brain to swell and that the progression of such an injury "depends on how rapidly the blood is accumulating and how much the pressure in the head is increasing following an injury." But like Dr. Graham, Dr. Rothfeder admitted that he never reviewed Child's CT scans.

¶ 26 In contrast, Dr. Boyer, a radiologist called by the State, had reviewed Child's CT scans and testified that there was only a thin layer of blood around Child's brain that was insufficient by itself to cause the degree of swelling that caused Child's death. And although Dr. Boyer stated that the scans showed evidence of "an older hemorrhage" around Child's brain, he acknowledged some uncertainty on that point and indicated that a pathologist could provide more information. The state medical examiners—who are both pathologists—testified that there was "no evidence" of an old bleed in Child's head, but defense expert Dr. Graham, also a pathologist, disagreed. There was also conflicting expert testimony on whether Child's injuries were consistent with inflicted trauma or spontaneous bleeding, but experts agreed that a partially healed intracranial bleed is susceptible to reinjury.

¶ 27 Construing this evidence in the light most favorable to Ruiz, see State v. Powell, 2007 UT 9, ¶ 27, 154 P.3d 788, we conclude that there was a rational basis for the jury to conclude that Child's death resulted from an old intracranial injury rebleeding while Child was in Ruiz's care, causing his brain to swell and die, and not from a traumatic brain injury that Ruiz inflicted on him by violent shaking. We now examine whether, if the jury accepted Ruiz's theory of Child's cause of death, there was a rational basis in the evidence for the jury to have acquitted her of reckless child abuse homicide and convicted her of negligent homicide.

2. Neglect Theory

¶ 28 A defendant acts with criminal negligence when she "ought to be aware of a substantial and unjustifiable risk" serious enough that "the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise in all the circumstances." Utah Code Ann. § 76–2–103(4) (LexisNexis 2012). And, ultimately, "criminal negligence requires a causal connection between [the] defendant's actions and the ultimate result." State v. Larsen, 2000 UT App 106, ¶ 20, 999 P.2d 1252. Consequently, for Ruiz's neglect theory to justify a lesser-included-offense instruction on negligent homicide, there must be evidence that Ruiz failed to intervene despite a readily apparent, unjustifiable risk of death and that her failure to act caused Child's death. See Utah Code Ann. § 76–5–206(1). We conclude that Ruiz was not entitled to a negligent homicide instruction under her neglect theory because even if the jury could have believed Ruiz's delayed response was criminally negligent, there is no rational basis in the evidence from which the jury could have decided that this delay caused Child's death.

¶ 29 Ruiz argues that the trial evidence reasonably supports a conclusion that she negligently ignored Child's symptoms of severe intracranial bleeding and that her neglect "played a role in his death." In support, she points to testimony from two experts that any caregiver who was "the least bit observant" would notice that a child suffering from a brain injury was in distress. Instead of responding quickly to Child's symptoms, Ruiz argues, her statements to police indicated that she "sat down and watched TV while she thought [Child] was asleep and ... didn't think

anything." Ruiz contends that the jury could have believed that her neglect caused Child's death by subjecting his brain to twenty to thirty minutes of oxygen deprivation, which would have exacerbated his brain injury. She cites the testimony of Dr. Lori Frasier, a pediatrician at Primary Children's who treated Child. She testified that as "the brain swells, [it] cuts off its own circulation, doesn't get enough oxygen, and the brain cells die." Paramedics also noticed that Child exhibited signs of oxygen deprivation when they arrived at Ruiz's home—he was "discolored," "purplish," had no pulse, and was not breathing. At the time, one paramedic believed that the Child could have had twenty to thirty minutes of "downtime" before they arrived, and this was a concern because "the quicker [they] can get to a patient," "the better chance [the patient] ha[s] of having a successful outcome." Finally, Ruiz cites testimony from Dr. Randy Oliver, an emergency room physician at Utah Valley Regional, that his role was to "stabilize" Child "to make sure that [his] oxygen saturations [were] at least above 90 ... so that you don't ultimately have brain damage."

¶ 30 Assuming without deciding that the jury could have believed Ruiz's delayed response was criminally negligent, there is still no rational basis in the evidence for a conclusion that Ruiz's neglect caused Child's death. Although two experts testified about the relationship between prolonged oxygen deprivation and brain injuries, none of the various experts who testified in this case, whether for Ruiz or the State, stated that Child had any chance of surviving the damage to his brain at the point the symptoms would have become apparent to Ruiz. For example, Dr. Frasier testified that brain swelling kills patients because as "the brain swells, [it] cuts off its own circulation, doesn't get enough oxygen, and the brain cells die." But she never mentioned whether Child's chances of survival would have improved at all had paramedics reached him sooner. Similarly, Dr. Oliver testified that emergency room physicians try to prevent brain damage by ensuring that patients have enough blood pressure to deliver oxygen to the brain. But he noted that Child's blood pressure and other vital signs were "stable" before he was transported to Primary Children's, and he did not indicate that a delayed response exacerbated Child's injury.

¶ 31 The only evidence that suggested Ruiz's neglect could have played a role in Child's death was the testimony of a paramedic who responded to Ruiz's 911 call. In response to a question about why paramedics would want to know how long Child had been asleep, he stated, "That gives us an idea of how resuscitable the patient is.... [T]he quicker we can get to him, ... the better chance we have of having a successful outcome for him." He also indicated that Child may have had anywhere from twenty to thirty minutes of downtime before paramedics arrived. But the first statement, however valid as a general principle, does not support a reasonable inference that Child's specific outcome would have been different had Ruiz acted more quickly. And when pressed about why he believed Child was unattended for as much as thirty minutes, the paramedic conceded that his memory was "not strongly reliable on that point" and based mostly on a "[v]ague impression." In fact, he also testified that the oxygen deprivation symptoms Ruiz identifies are noticeable "within just a couple of minutes" after a person stops breathing.

¶ 32 General assertions about prolonged oxygen deprivation and brain damage are simply not enough to support a conclusion that Ruiz's delay of about twenty to thirty minutes in calling for medical assistance once Child's symptoms became apparent led to his death. In *State v. Warden*, 813 P.2d 1146 (Utah 1991), for example, the Utah Supreme Court found "ample evidence" of causation in a negligent homicide case based on expert testimony that a doctor's failure to hospitalize a baby made it "twenty times more likely" that the baby would die. *Id.* at 1150–51. There was also testimony that the baby "would have had better than a 99 percent chance of survival" had the doctor acted "in accordance with the appropriate standard of care," *id.*, and that the baby's parents would have taken it to the hospital had the doctor not advised them otherwise, *id.* at 1152–53.

¶ 33 *Warden,* of course, involved a sufficiency of the evidence claim, not a request for a lesser-included-offense instruction, so Ruiz had a much lower evidentiary bar to clear than the defendant in that case. And something less dire than the circumstances in *Warden* might support a finding of causation in any event. Nevertheless, Ruiz has not pointed to any material evidence from a medical expert or Child's physicians from which a jury could reasonably have concluded that his brain damage may not have been fatal had treatment been provided sooner. Rather, she relies on evidence that suggests only a general relationship between delay in treatment and fatal results without showing that Child's death in this case could have been averted had she reported his condition earlier.

¶ 34 As a consequence, we conclude that the evidence did not support a jury instruction for negligent homicide on the basis of Ruiz's neglect in failing to seek medical treatment for Child's condition earlier than she did. *Cf. State v. Larsen,* 2000 UT App 106, ¶¶ 15, 20, 999 P.2d 1252 (holding in a negligent homicide case that a defendant's alleged intoxication and failure to use a turn signal did not cause the victim's death in a car accident because the state did not show "any causal connection between the collision and the alcohol ... or defendant's failure to activate his turn signal").

3. Slight–Shaking Theory

¶ 35 Ruiz is also not entitled to a lesser-included-offense instruction under her slight-shaking theory. She argues that one rational view of the evidence is that she "contributed to [Child]'s death by shaking him ... and that the shaking was negligent, but not reckless." Ruiz cites Dr. Rothfeder's testimony that a "bleeding disorder makes things fragile so the bleeding can occur spontaneously." She also points to other testimony that Child had an old hemorrhage at least two weeks prior to his death and a coagulation defect stemming from a vitamin K deficiency. "If the jury believed [Drs.] Boyer, Rothfeder, and Graham's evidence of an earlier hemorrhage and bleeding from at least two weeks before the death," Ruiz asserts, it

"may have believed that [her] admitted shaking ... contributed to [Child]'s death by causing a rebleed." We are not persuaded, however, that this evidence reasonably supports a negligent homicide conviction.

¶ 36 No reasonable interpretation of the evidence supports a conclusion that Ruiz committed negligent homicide by gently shaking Child. To conclude that Ruiz acted with criminal negligence, there must be some evidence that she should have been "aware of a substantial and unjustifiable risk" serious enough that "the failure to perceive it constitute[d] a gross deviation from the standard of care that an ordinary person would exercise in ... the circumstances." *See* Utah Code Ann. § 76–2–103(4) (LexisNexis 2012). This standard poses two problems for Ruiz under these facts. First, Ruiz would have to show that her "slight shaking" of Child was criminally negligent. But the shaking that Ruiz described to police seemed to be no more than a relatively gentle attempt to awaken Child, not something the jury could have concluded would amount to a gross deviation from the standard applicable to a caregiver in the circumstances. Nor was there evidence that Child's symptoms were such that even a reasonable caregiver should have known that Child's brain was in an unusually fragile state, much less that her failure to perceive that was a gross deviation from the standard of care that made her slight shaking of Child criminally negligent.

¶ 37 Second, and perhaps more significantly, even if her failure to perceive the risk amounted to criminal negligence, Ruiz would still have to identify evidence that she negligently shook Child in a way that was not "child abuse" within the scope of the child abuse homicide statute. *See supra* ¶¶ 17–21. Under the statute, child abuse includes the infliction of any serious physical injury that "seriously impairs the child's health; ... involves physical torture; ... causes serious emotional harm to the child; or ... involves a substantial risk of death to the child." Utah Code Ann. § 76–5–109(1)(f)(i) (LexisNexis 2012). And "intracranial bleeding, swelling or contusion of the brain, whether caused by blows, shaking, or causing the child's head to impact with an object or sur-

face" is identified as a specific example of conduct that qualifies. *Id.* § 76–5–109(1)(f)(ii)(B). Further, child abuse can be committed knowingly, recklessly, or with criminal negligence. *Id.* § 76–5–109(2). Consequently, if Ruiz shook Child even though she should have been aware of the risk that doing so could cause fatal intracranial bleeding, her conduct would amount to child abuse falling within the purview of the child abuse homicide statute, and an instruction on negligent homicide would be unavailable. *See supra* ¶¶ 17–21.

¶ 38 In summary, we conclude that although the statutory elements of child abuse homicide and negligent homicide overlap, there is no rational basis in the evidence for the jury to have convicted Ruiz of negligent homicide. No reasonable interpretation of the evidence supports a conclusion that Ruiz's delayed response caused Child's death or that Ruiz negligently harmed Child in a way that did not amount to child abuse. Consequently, the trial court did not abuse its discretion in refusing to instruct the jury on negligent homicide.

## II. Impeachment Testimony

¶ 39 Ruiz's second challenge is to an aspect of the State's rebuttal testimony that she argues unfairly prejudiced her defense. Specifically, she claims that the district court abused its discretion when it allowed Stoker, a DCFS case manager, to testify about the agency's administrative finding of substantiated abuse in Ruiz's case. *See State v. Burke*, 2011 UT App 168, ¶ 16, 256 P.3d 1102 (noting that appellate courts review the "decision to admit or exclude evidence" under rule 403 for "an abuse of discretion" (citation and internal quotation marks omitted)). Although Ruiz concedes that she opened the door, she argues that Stoker's testimony violated rules 402 and 403 of the Utah Rules of Evidence in two ways. First, it improperly "bolstered the testimony and evidence of the doctors and the hospital by indicating that DCFS had evaluated their information and found it to be credible." And second, the statements indicated that an agent of the state of Utah had already evaluated the evidence and concluded that Ruiz had "committed physical abuse serious due to an infant dying in her care." (Internal quotation marks omitted.) We conclude that the trial court did not abuse its discretion in admitting the State's rebuttal testimony.

¶ 40 As a general rule, "it is proper to allow as rebuttal any testimony which would tend to dispute, explain or minimize the effect of evidence that has been given by one's opponent." *State v. Sanders*, 27 Utah 2d 354, 496 P.2d 270, 274 (1972). When a defendant takes the stand in her own defense, she "then becomes subject to being treated the same as any other witness." *State v. Green*, 578 P.2d 512, 514 (Utah 1978). Thus, she becomes vulnerable to "cross-examination on any matter which would tend to contradict, explain or cast doubt upon the credibility of [her] testimony." *Id.* And testimony from other witnesses that serves the same objectives is admissible in rebuttal. *Id.* By taking the witness stand, then, a defendant can "open the door" to the admission of evidence that could otherwise be considered irrelevant or unfairly prejudicial; she "cannot introduce potentially inflammatory evidence and then later complain when the opposing party attempts to rebut it." *State v. Mahi*, 2005 UT App 494, ¶ 17, 125 P.3d 103.

¶ 41 Ruiz concedes her testimony that "[DCFS investigators] probably did a better investigation ... than [the] Provo Police" and "they didn't charge me with anything" opened the door to some level of rebuttal from the State. But she argues that the rules of evidence still required the court to exclude any information in Stoker's testimony whose "probative value [was] substantially outweighed by a danger of ... unfair prejudice." Utah R. Evid. 403.

¶ 42 As the district court noted, however, Ruiz's own testimony suggested "that the juvenile court [proceedings] ... were complete and essentially amounted to an exoneration." Had the district court excluded the portion of Stoker's testimony that Ruiz challenges on appeal, nothing in her testimony would have dispelled Ruiz's central inference. Indeed, with the exception of her testimony regarding DCFS's finding of child abuse, Stoker's testimony was largely consistent with Ruiz's own description of the investiga-

tion. Both Stoker and Ruiz testified that (1) DCFS removed Ruiz's children from her care, (2) the children were returned after a shelter hearing, (3) the juvenile court ordered protective supervision services, and (4) the juvenile court eventually dismissed the petition against Ruiz. But Ruiz went further when she also testified that after a comprehensive investigation, DCFS investigators "closed their case. They didn't charge me with anything." Stoker testified that while DCFS employs a different standard of proof than what is required in criminal proceedings, it does make findings of either "support[ed]" or "without merit" when it concludes an investigation. And in this case, according to Stoker, DCFS made substantiated findings of child abuse. Thus, only Stoker's statement that the agency's findings "supported physical abuse ... due to an infant dying in [Ruiz's] care" effectively rebutted Ruiz's implication that, having completed a more thorough investigation than the police, DCFS ultimately concluded she was innocent.

¶ 43 Ruiz cites *State v. Houskeeper*, 2002 UT 118, 62 P.3d 444, and *State v. Moody*, 2012 UT App 297, 288 P.3d 1092, for the proposition that the district court had an obligation to appropriately tailor the case manager's rebuttal testimony in a way that minimized its prejudicial effect. However, her reliance on those cases is misplaced. First, in *Moody*, we held that testimony from the defendant's parole officer that handling investment money violated his parole was irrelevant to charges that he solicited investments under false pretenses. 2012 UT App 297, ¶ 9, 288 P.3d 1092. But unlike the case manager's testimony in this case, the parole officer's statement was not rebuttal testimony, and the defendant never testified that his parole imposed no financial restrictions. *See id.* ¶¶ 10–12. Consequently, the defendant never opened the door to the statements we held were irrelevant, *id.*, and *Moody* is therefore inapposite.

¶ 44 Second, *Houskeeper* involved otherwise inadmissible character evidence that was not necessary to rebut the defendant's testimony. In that case, the court ruled before trial that any evidence of the defendant's past sexual conduct was inadmissible in the context of the sexual abuse charges against him. 2002 UT 118, ¶¶ 5–6, 62 P.3d 444. At trial, the defendant opened the door to rebuttal testimony when he testified that a phone conversation he had with a witness during trial was "an innocent inquiry," not an attempt to influence her testimony. *Id.* ¶¶ 7, 28. The trial court allowed the witness to describe the conversation even though the defendant had discussed a prior sexual encounter between himself and the witness. *Id.* 17. The Utah Supreme Court affirmed the district court's decision, noting that the prosecutor "refrained from questioning" the witness "about the prior incident beyond those facts pertinent" to the defendant's credibility. *Id.* ¶ 30. Here, the State never sought to introduce evidence of Ruiz's character, and the testimony she challenges on appeal is directly relevant to rebut assertions in her testimony. In fact, the case manager's testimony was essential to rebut Ruiz's assertion that DCFS had essentially exonerated her after a thorough investigation, so its probative value was very high in relation to the potential for unfair prejudice. *See* Utah R. Evid. 403.

¶ 45 We conclude that because Ruiz herself "introduce[d] potentially inflammatory evidence" about DCFS's investigation, she cannot now complain about the State's legitimate attempts to rebut it. *See State v. Mahi*, 2005 UT App 494, ¶ 17, 125 P.3d 103. Ruiz has therefore not shown that the district court abused its discretion in admitting the DCFS case manager's testimony.

## CONCLUSION

¶ 46 We conclude that Ruiz was not entitled to an instruction on negligent homicide because there was no rational basis in the evidence to convict her of that offense and acquit her of reckless child abuse homicide. We also conclude that testimony regarding DCFS's findings of child abuse was properly admitted because Ruiz opened the door by claiming the agency found no wrongdoing on her part.

¶ 47 Affirmed.